# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| LESTER CARPENTER REED, | ) |
| Plaintiff, | ) |
| v. | ) 5:10-cv-02629-JEO |
| WARDEN BILLY MITCHEM, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Upon agreement and consent of the parties, this matter was tried on the merits before the undersigned without a jury. *See* 28 U.S.C. § 636.  Plaintiff Lester Carpenter Reed alleges that defendant Charles Brock violated his constitutional rights in that he used excessive force on Reed while he was incarcerated at the Limestone Correctional Facility.  Brock denies the allegations.  Hence the need for a trial on the merits.  Premised on the evidence adduced at the trial, the court finds in favor of the defendant.

**I.    THE EVIDENCE**

    **A.    Lester Carpenter Reed**

Mr. Reed testified that he has been incarcerated at the Limestone Correctional Facility for approximately 26 years.  He is about five foot, six inches tall and he weighs about 165 pounds.  He has known defendant Lieutenant Brock for some time.  He is even aware of the fact that Captain David Tulley[1] at the facility refers to Brock as his "attack dog."

---

[1] Tulley's first name was not adduced during the hearing but is available from the docket sheet as he was formerly a defendant.

The present incident arose out of the fact that other inmates[2] purportedly approached Reed about filing tax returns on their behalf. According to Reed, he was to provide an outside address to have tax refunds delivered, he was then to have someone cash the refund checks, and send a money order back to the respective prisoners. The other inmates each offered to pay him $100 for his services. Reed talked to his sister about using her address for delivery of the refunds. According to Reed, she would only do it if the other inmates executed some type of power of attorney to allow her to cash the checks. Accordingly, the four inmates each executed a power of attorney and provided them to Reed on May 3, 2010.

That same day, Reed was called to Lieutenant Brock's office. Brock told Reed that the four other inmates did not want to be in his (Reed's) income tax scheme. Brock then told Reed to get the tax forms from his personal effects. Reed became angry because Brock did not ask him any questions concerning his side of the matter. "So [he] refused" to get the forms. He told Brock to get the "damn" forms himself. He further stated, "I will show you where they are at and you can confiscate them and then I will file a legal action against you challenging you over my privacy rights because them [sic] are my legal papers." Reed also believed there were privacy issues with the papers because they belonged to the other inmates who had trusted him with them.

When Brock heard Reed's response, he jumped up from his desk and ordered Reed to follow him to the dormitory to retrieve the documents. During the walk to the unit, Brock told Reed that he was going to "lock his ass up." Reed responded that he did not give a goddamn because he had been locked up the whole time he had been there. Reed described Brock as being

---

[2] The other inmates include Ariel Dozer, Ellis Vaughn, Vincent Figurola, and Kenneth Brown.

very angry. As they were approaching the unit, Brock was "screaming" about how he did not like Reed. When they arrived at the unit, they stopped inside the lobby. Another officer, Jimmy Hawkins, who had been inside the "cube" area, was waiting for them. Brock ordered Hawkins to take Reed to cell to pack his property. Hawkins began escorting Reed into the populated part of the unit. Once they were inside the dormitory area behind the riot door (the door that separates the dormitory area from the lobby area), Brock stepped to the right and said "Reed I ain't scared of you." Reed did not say anything to Brock because Brock was angry. Reed then said to Brock that he was not "scared of his bald headed ass neither" as they passed Brock and left him at the riot door.

      About the time Reed and Hawkins were halfway into the unit, Hawkins asked Reed why Brock was locking him up. Then, before he could respond, Brock "suddenly slammed" into the back of Reed's neck with enough force to send him "stumbling forward." Reed "whooped [him] under the neck and drew [him] into his chest bowing [Reed's] back in a choke hold." Brock then lifted him off the floor "like in a hangman's noose ... with nothing touching but [his] toes on the floor." Brock twisted Reed's neck and was attempting to fold his neck during the incident. Brock also applied pressure to the back of Reed's neck. According to Reed, Hawkins was so "shocked"over the actions that he jumped back and said "what did he do" and Brock said put the cuffs on him.[3] Reed said, "[Y]ou might as well beat me lieutenant, you might as well beat me." Hawkins put cuffs on Reed while Brock held Reed in the "choke hold." Brock ordered Hawkins to take Reed to his cell. Brock then turned and exited the building. Reed said he did nothing to provoke the physical attack by Brock.

---

[3] Hawkins was not presented as a witness at trial.

Hawkins took Reed to his cell, got another inmate to pack his property, including the power of attorney forms from the other inmates. Reed gave Brock the power of attorney documents once he got to the lock down dormitory. An officer by the last name of Koon took Reed to the healthcare unit about fifteen minutes later to be examined. A "body chart" was prepared. (Pl. Exh. 15). It lists an abrasion to the right side of Reed's neck with small amount of blood. (*Id*.) Reed stated that he was experiencing "intense pain" during the visit with nurse. He did not receive any treatment or medication at the health center during the visit. Pictures of his injuries were taken after blood was cleaned off. (Pl. Exh. 4). No significant injury or swelling was noted. (*Id*.)

Reed was not written up for threatening Brock as a consequence of these events. He was written up for disobeying a direct order and for violating institutional rules when he refused to provide Brock with the power of attorney forms. According to Reed, Brock was present during the disciplinary proceedings and allegedly stormed out during the process. Reed received twenty-one days punishment as a consequence of the disciplinary proceeding.

Reed had prior interaction with Brock when he (Reed) orchestrated a hunger and pill strike in the Aids unit at the prison. Brock was sent to the unit to handle the situation. They were also involved in a event where food trays were not being cleaned properly.

Reed sought medical attention on May 4, 2010, the day after the event. He did so by completing a sick call request form. He complained of severe pain in neck and stated that the right side of his neck is inflamed. He stated that he also was having difficulty speaking. (Pl. Exh. 16). Reed did not see a medical specialist on May 4 for his complaints. Prior to the incident he stated he never had any neck/back issues. Reed made another request for medical

attention on May 8, 2010. (Pl. Exh. 17). He complained of pain in his neck, difficulty swallowing, and an inability to sleep. He was seen by a licensed practical nurse at the Limestone facility. On May 11, 2010, Reed was experiencing muscle spasms in his neck where Brock had applied force. (Pl. Exh. 18). He was given Tylenol, which initially helped. However, the pain continued to get worse. He filed out another sick call request on June 1, 2010. (Pl. Exh. 19). Reed complained of pain, but now it was in the lower part of his neck. He was still in segregation at this time. He saw a nurse on June 3, 2010. He indicated that the ibuprofen he had been given was helping.[4] More ibuprofen was ordered. (*Id*. & Pl. Exh. 20). His next sick call request was July 6, 2010. (Pl. Exh. 21). He complained of pain in same areas as he has previously been experiencing discomfort, but the pain was getting worse. He noted that the medication would "knock the edge off" the pain for a while. He was also seen by a medical provider on July 8, 2010. (Pl. Exh. 22). He again complained of pain in the back of his neck. His pain level was an eight on a ten point scale. He was given a five day prescription of ibuprofen. (*Id*.) It helped with the pain, but did not completely alleviate it.

On July 15, 2010, he filed a medical grievance (Pl. Exh. 23), concerning the treatment of his neck pain. Therein, he complained that "an officer injured my neck," referring to the incident with Brock. (*Id*.) In response, the nurse reviewed his chart and spoke to the doctor. It was noted that they (the medical staff) would reevaluate Reed's situation at the next chronic care appointment. (*Id*.)

On August 3, 2010, diagnostic imaging was conducted on Reed's spine. The report indicated that his "alignment is satisfactory with DJD and disc space narrowing at C5-6 and C6-

---

[4] Reed consistently testified that he had never experienced pain like this before the incident with Brock.

7." (Pl. Exh. 24).

Reed filed another grievance dated October 11, 2010. He stated that the pain was getting worse and that the Motrin wasn't working much anymore, that he was eating Motrin "like candy," and that the pain had moved to his lower back and hip. (Pl. Exh. 25). The medical staff responded that he would need another examination to address the situation. (*Id*.) On October 29, 2010, Reed completed another medical request, stating that the pain had been constant since May 3, 2010. (Pl. Exh. 26). He was referred to a radiologist on November 4, 2010, for testing. The radiology report indicated that "[t]here is anatomic alignment of lumbar vertebrae. The vertebral bodies have normal shape and ossification pattern. Posterior elements are intact." (Pl. Exh. 27). The conclusion was "Normal lumbar spine series." (*Id*.)

The nursing notes from Reed's November 5, 2010, visit state that he has chronic back pain at a level of nine on a ten scale. He was not prescribed any medication and was encouraged to exercise as pain management. (Pl. Exh. 28). On November 12, 2013, Reed filed a medical grievance appeal referencing the assault and his radiating pain. (Pl Exh. 29). He also filed another sick call request on November 16, 2010, complaining of continuing neck and spinal pain over the last six months. (Pl. Exh. 30). In the nurses notes on November 24, 2010, tingling in his fingertips was noted. (Pl. Exh. 31).

Imaging on his spin area was done on January 13, 2011. The report indicated that there was chronic L4-5 and L5-S1 focal degenerative disease and that the left leg pain may be partially related to the asymmetric facet joint hypertophy on the left at L4-5. The conclusion was that he was experiencing degenerative disc disease. (Pl. Exh. 32). Reed filed a medical grievance on February 1, 2011, stating that he had not been informed of his MRI results and that he needed a

renewal of pain medication. (Pl. Exh. 33). He was seen on February 2, 2011, by a nurse. The notes indicate that he was still reporting that he was in constant pain at a level of 10 on a 10-point scale. They also note that Reed reported constant pain that increases with movement. (Pl. Exh. 34).

On February 10, 2011, Reed filed another medical grievance stating that he never had trouble walking prior to May 2010 and that the pain began to affect his walking in October 2010. (Pl. Exh. 35).

On April 5, 2011, Reed filed yet another medical grievance appeal. In response, Dr. Crocker informed Reed that he was "pretty messed up" and that there was nothing he could do for Reed. (Pl. Exh. 36). By April 23, 2011, Reed's left shoulder was constantly hurting and his arm was starting to turn numb. (Pl. Exh. 37). Reed filed another sick call request on June 26, 2011. He had previously been given exercises to do, but they did not help and only made the pain worse. (Pl. Exh. 39). On July 2, 2011, his sick call slip indicated that he was still in pain, he wanted an orthopedic consult, and he was having pain in his arm. (Pl. Exh. 40). He next filed another medical grievance appeal on September 1, 2011. Therein, he noted he was still in constant pain since the altercation with Brock in May 2010. He states that he wants a visit with an orthopedist. (Pl. Exh. 41). He was scheduled to be seen by Dr. Hood, a Corizon Medical Services director for the region. (*Id.*)

On November 8, 2011, Reed had surgery. (Pl Exh. 42). Doctors repaired his lower spine. He received some relief from the intense pain for a while as a result of the surgery. After he had surgery on his back, the doctor recommended surgery on his neck as well. It was also performed.

During cross-examination, Reed stated that he had not gotten a disciplinary for fighting

with a member of the Department of Corrections' staff.  However, the defendant's counsel adduced information that in March 1995 Reed received a disciplinary write-up for assault on a person associated with the Department of Corrections.  (Def. Exh. 1 at 1).  Reed also acknowledged that there were approximately 152 inmates in his dorm.  He denied making the following statements: June 2012 – stating that eventually they will have to let me out because I'm becoming expensive; May 2012 – stating that he was filing law suits in hopes of getting out earlier; and August 2012 – stating that he was going to hit them up for so much money they won't keep me in here.  He admitted to transferring money into other inmates accounts to avoid paying filing fees.

In a subsequent psychiatric interview, Reed "reports that [the] initial choke hold caused immediate neck pain and [he] thinks it might have been caused in part by the buffalo hump on the back of his neck."[5]  (Def. Exh. 2 at 1).  Reed also acknowledged having had a kidney stone in July 2009.  (Def. Exh. 3).  He also had back pain complaints in a prior year - 1995.  (Def. Exh. 4, 5).  His medical records further indicate that he was treated for a "crushed disc" in 1988.  (Def. Exh. 5).  However, Reed does not remember being treated for a disc injury.  His medical records also indicate that in a psychiatry interview in January 2012, he said he had "total relief" from the back pain since surgery.  (Def. Exh. 7).

B.   **Nurse Misty Haynes**

Nurse Haynes was employed for Corizon Medical Services as an LPN working at Limestone Correctional Facility.  She filled out Reed's body chart after the incident with Brock.

---

[5] A "buffalo hump" is a collection of fatty tissue Reed attributes to the taking of certain of his medications.

### C.   Karen Amborski

Ms. Ambroski also works for Corizon. She is a health care supervisor and is familiar with the company's medical records. She reviewed Reed's medical file but didn't see any documentation in the file that says that Reed's injuries were caused by the May 3, 2010 altercation. She also testified that there is documentation in the file that shows that Reed had been diagnosed with degenerative joint disease prior to the incident with Brock.

### D.   Lieutenant Brock

Brock testified that he was notified by Captain Tulley that there was income tax fraud going on within the institution involving Reed and four other inmates. Brock spoke with the four inmates about the power of attorney forms they had executed and given to Reed with the expectation that they would each receive about $1,032.00 as a tax refund. After speaking with the four inmates, Brock called Reed to his office about the matter. Brock informed Reed that the four inmates wanted the power of attorney forms back. Reed refused to go get the forms. Brock ordered Reed to get the forms, which Reed refused to do. Brock then told Reed that he was going to lock him up if he did not comply with his order.

Brock next escorted Reed to his dorm unit to retrieve the forms. They did not talk on the walk to the dormitory. Brock was walking to the right and behind Reed for safety reasons. Brock testified that it was best to be behind and to the side of an inmate. When they entered the dorm area, Hawkins was there already. As they entered, Reed became real loud and angry about how Brock was violating his constitutional rights. About that time, Reed turned quickly back

toward Brock.[6]  He was yelling about how Brock did not have the right "to the damn forms." Brock pushed Reed away and then commenced a "shoulder pin maneuver" intended to restrain Reed.  Brock told Reed to stop, saying "you don't want to do this."  Reed then relaxed, and Brock simply maintained the hold he had on him.  Brock then called for Hawkins to handcuff Reed.  Because Hawkins did not have any cuffs, Brock told him to get his.  Reed was cuffed. Brock told Hawkins to take Reed to another dorm and to get a body chart examination done on him.[7]

Brock explained how it is a problem when inmates yell in the unit because that can instigate issues with other inmates.  This is particularly true in the dormitory units because of the large number of inmates inside each unit (approximately 152) and the few prison personnel that are present (approximately three).

Brock also explained the "shoulder pin maneuver" was a control tactic.  He noted that he was a defensive tactics trainer and that he had only used this procedure twice on inmates before this incident.  He never experienced any complications with its use.  One aspect of the maneuver is that it tricks the individual into thinking he can not breathe, thus causing him to cease resisting. Brock stated that the maneuver is not designed to pick the individual off ground as was mentioned by Reed during his testimony.

Brock admitted that he had words on prior occasions with Reed.  He also admitted that

---

[6] Brock described the movement as follows:

> He (Reed) was turning.  If I sit and wait -- if I'm escorting a potentially violent inmate who is showing signs of violence by being loud and disruptive and yelling and cursing, I'm not going to stand and let him completely turn especially if he's turning quickly and hit me and then try to stop him from doing it and keep him from hitting me or someone else or erupting the dormitory. I'm required by law to do that by my relations....

[7] The court is aware that this is a standard course of action after a physical incident involving an inmate.

while he was working as an officer he kept a desk diary and that he wrote everything down in it.[8] He wrote notes from this incident, however, he destroyed diary along with all the rest of his diaries in August 2011 when he retired. He did not feel that there was any need or reason to keep them.[9] He also testified that he did not consult the incident report of the event that he prepared when he was writing the affidavit that was submitted in this case. He stated that he looked at his diary instead of the incident report because he assumed the information would be the same. He admitted that he was on notice of this lawsuit, but destroyed the diary anyway. Brock also acknowledged that he did not obtain any witness statements concerning the event.[10] He further acknowledged that his affidavit incorrectly asserts that the statements of the four inmates concerning the powers of attorney were shown to Reed before he asked Reed for the power of attorney forms back. However, he noted the incident report he prepared is a better recitation of events than the affidavit. The incident report states that the inmate statements were made after the altercation and not before it as specified in the affidavit. Brock also stated that the incident report does not properly characterize Reed's movement. It states, "At this point, Inmate Reed stopped talking and began to turn towards Lieutenant Brock. Quickly, Lieutenant Brock reached out with Lieutenant Brock's right hand and placed it on the back of Inmate Reed's neck...."[11] (See Pl. Exh. 2 at 2). Brock attributes the mistake to a typographical error. He meant for the

---

[8] Later, he described the diary being for "just quick notes."

[9] Specifically, Brock testified that he did not feel like the suit was "going anywhere."

[10] Brock testified that Hawkins didn't see anything, thus there was no need for a witness statement. He also stated, contrary to Reed's testimony, Hawkins was no where near the incident and that Brock hadn't asked Hawkins to escort Reed to his cell until after the incident. In fact, there was no further investigation of the incident at all. On cross-examination, Brock acknowledged that his "total investigation" of the tax fraud matter lasted only seven minutes.

[11] The incident report is written in third person form.

report to indicate that Reed quickly turned towards him.

Brock also testified that he did not have any have knowledge as to whether the May 3 incident caused Reed's injuries. He further was not aware of whether Reed had prior problems. He also testified that he did not leave Reed's disciplinary proceeding[12] in the angry manner as testified to by Reed. To the contrary, he stated that he did not leave the proceeding until his testimony had been completed and he was excused by the hearing officer.

## II.     THE LAW

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment. U.S. CONST. amend. VIII. "In considering an Eighth Amendment excessive force claim, [this court] must consider both a subjective and objective component: (1) whether the 'officials act[ed] with a sufficiently culpable state of mind,' and (2) 'if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.' *Hudson v. McMillian*, 503 U.S. 1, 8, ... (1992) (internal quotations omitted)." *Tate v. Rockford*, 497 Fed. App'x. 921, 923 (11th Cir. 2012).

Accordingly, Reed's excessive force claims against Brock must be analyzed under the standard set forth in *Hudson* and *Whitley v. Albers*, 475 U.S. 312 (1986). *See Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). In *Hudson*, the Supreme Court held that in assessing an inmate's excessive force claim, "the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. In extending *Whitley* to all cases involving allegations

---

[12] Reed was written up on the failure to follow a command related to the power of attorney forms and not as a result of the incident in the unit. Brock explained that Reed was not cited because Brock "stopped it before it happened."

12

of the use of force by prison officials, the Supreme Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 9 (citations omitted). "[T]he 'core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Skelly v. Okaloosa County Bd. Of County Comm'rs*., 456 Fed. App'x. 845, 847-48 (11th Cir. 2012) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 3637, 130 S. Ct. 1175, 1178 (2010)).

With these concerns in mind, the Supreme Court set out certain factors that should be considered when evaluating whether the force used was excessive. These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. *Hudson*, 503 U.S. at 7; *see Hewett v. Jarrad*, 786 F.2d 1080, 1085 (11th Cir. 1986). In applying the foregoing factors to the facts of a particular case, the Supreme Court has instructed:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9 (internal citations omitted).

In the present case, one additional consideration is at issue – proximate cause. Counsel for the defendant asserts that Reed's injuries are not a consequence of Brock's actions, but due to prior back issues. Counsel for the plaintiff disagrees.

## III. DISCUSSION

### A. The Injury

Because causation is the easier issue in this case, the court will address it at the outset. The testimony and medical records indicate that Reed had some back issues before the May 3, 2010 incident involved herein. However, none of the prior complaints, which principally were back in the 1990s, demonstrate the severity and regularity of those voiced subsequent to the incident. All the medical records and Reed's testimony are consistent with a finding that the May 3 incident was the cause of the plaintiff's neck and back problems, which led to the required surgeries.

### B. The Excessive Force Claim

#### 1. The need for application of force

There are two distinct views of the evidence in this case. Reed states he did not provoke the attack by turning towards Brock. In contrast, Brock assets that Reed was loud, angry, and moved aggressively. While Reed argues that he did not provoke the response from Brock, the evidence demonstrates that he was upset with Brock's failure to make adequate inquiry into the alleged tax fraud. He was bothered by the fact that Brock did not seem to want to hear his side of the matter. He disobeyed a direct order from Brock to retrieve the documents. It is clear that by the time the parties entered the unit, Reed was displeased with the situation to the point of being angry.

The court does not find the testimony of Reed that he did not act in an aggressive manner credible. To believe this, the court would have to conclude that Brock simply decided to attack Reed in front of Hawkins, the cube officer, and approximately 150 other inmates. Having heard all the evidence and having observed Brock, this simply does not make sense. The court finds that the more credible evidence supports the conclusion that Brock reasonably perceived a need for action premised on Reed's verbal actions and his quick movement in Brock's direction. This is particularly true in view of the fact that the need to maintain control in such a setting is essential in light of the large number of inmates in the unit.

### 2. The relationship between that need and the amount of force used

Having perceived a need for force, Brock responded with a move he had practiced and demonstrated many times before. While he had only used it twice before in a threatening situation, he was familiar with its effect in bringing inmates into compliance. As best this court can discern, the maneuver is defensive and not intended to inflict harm.[13] The maneuver appears to have been a reasonable response to a threatening situation in a difficult environment.

### 3. The threat reasonably perceived by the responsible official

As already noted, the court credits the testimony of Brock regarding his perception of the events, particularly the movements of Reed. When coupled with Reed's outward disdain for the way Brock was handling the situation, Brock reasonably perceived that this was a threatening situation warranting a response.

### 4. Any efforts to temper the severity of a forceful response

This event occurred very quickly, allowing little time to temper the response. If Brock

---

[13] The only testimony concerning the effect and operation of the move came from the defendant.

had not acted with a defensive response, he would have been exposed to physical reprisal from Reed who would have been particularly close to his person. Additionally, it may have provoked a response from other persons on the unit. Once Reed was controlled, Brock had Hawkins secure his hands, totally diffusing the situation. Under the circumstances, that is all that could be reasonably be expected.

        **5.**    **The extent of the injury suffered by the inmate**

Again, as noted above, the injury suffered by Reed as a consequence of this event is severe and very unfortunate. The court is convinced that he endured, and my still endure, significant neck and back pain. Even if he had some back issue or issues before the event, the execution of the maneuver in this instance appears to have greatly exacerbated any prior problems.

In sum, premised on the totality of the evidence, the court finds that Reed has not met his burden in demonstrating that Brock acted with the requisite intent to support his claim of excessive force under the Eight Amendment.

**IV.**    **CONCLUSION**

Premised on the foregoing, the court finds in favor of the defendant on the merits of the plaintiff's claim. Accordingly, a judgment will be entered by separate order in favor of the defendant and against the plaintiff.

The Clerk is **DIRECTED** to serve a copy of this Memorandum Opinion upon counsel of record.

**DONE**, this the 3rd day of September, 2013.

*/s/ John E. Ott*
_____
**JOHN E. OTT**
Chief United States Magistrate Judge